The first case is Harge v. City of New York. Either microphone. Good morning, your honors. If it please the court. Need to lower a little bit. Yeah, can you? Yes, sir. You used to be taller. Say what? This is good, thank you very much. Good morning, your honors. If it please the court. Pursuant to Bennett v. Health Management System, Inc., the New York City claims are clear here, and they should not have been dismissed. The court misread that, the court below. And the federal claims should fly as well. Now, the court below found that the plaintiff has not met his initial burden to put forth evidence suggesting an inference of discriminatory motivation for those actions. Let me point out that Harge was the only patrol officer, black patrol officer, on Highway 3. There was another officer there, Lieutenant Braithwaite. He's not a patrol officer. He doesn't go on patrol as a lieutenant. He's not on a regular basis. So he's the only one. And the most important two witnesses here, and the most important three witnesses, besides Harge, we have Sergeant Kazin, his direct supervisor, who lists a whole group of conditions that were only for Harge, nobody else. Now, the inference is clear. He's the only black officer. He's the only one with these conditions. And here's some of the conditions, because I'm sure I know the justices of this court read the briefs in detail. But here are some of them. He had to obtain less time in a different manner. He's not allowed to drive an unmarked vehicle. That's unheard of in highway, and you can't make arrests that way. And when he started being denied the unmarked vehicles, his arrest got knocked down. And you can see that in his overtime records, which started 1076 and end, I think, at about 1084 of the appendix. He was always assigned to the same spot. That also makes it much more difficult to make arrests. He was not allowed to collect his summonses before court. Everyone was given a few hours. And why is this important? Because you can be written up for being unprepared. Can't get to court in time. You can't collect your summonses. And then you're apparently not cooperating with the DA, when, in fact, it was only because of this specific rule that was only for hards. He got a CD for being off post, when, in fact, he was with his supervisor instructing him as how to go about testifying in a criminal court. And that was not substantiated, though, right? Yeah, that one was. That's correct. There's one of three charges that are not substantiated in a department advocate's trial. OK, that's correct. But nevertheless, there's a disparate. Even makes it more relevant, Your Honor, if I may. Lieutenant Levine told Kazin not to approve of Hodge's day off. And he had to go through a special condition to get his days off. Defendant Sanford and Levine ordered Kazin to give plaintiff endless work. They didn't do any of this stuff to other people. Kazin testified he was informed of plaintiff's request that days off would be refused as much as possible. He was constantly called back to the station house, making it hard for him to do his job. And if I'm correct, under Harris v. Forklift, making it harder to do your job is one of the criteria, at least under progeny, if not specifically in Harris v. Forklift. How many of these are adverse, sufficiently adverse, for a federal thing? I understand what you said about the city, which is much easier, and what is adverse. How many of these are sufficiently adverse? Or are you saying that the combination of them makes it sufficiently adverse, even though some of these we would not treat as an adverse action in themselves? Not to pander, but you said it much more eloquently than I would have, Your Honor. I'm just a trial attorney. But that was perfectly put. I mean, these whole conditions, he's in an entirely different state of affairs than everybody else. And these did result in lost income, and that's important. And I urge the court to look at the overtime record, starting at 1076 and ending at 1084. And what you'll see is, if you remember, he was nominated for the Mother Against, or he was given the Mother Against Drunk Driving Award in 2014 in March. And he's supposed to be, excuse me, recommendation, recommended for promotion to detect a specialist, which would be an increase in salary. And that just disappears. And that's also in March. Could you, is there anything in the record? I had trouble understanding the promotion system. Just from whatever past experience I've had, which is obviously not representative, I'm familiar with people being promoted to sergeant or lieutenant by taking a civil service exam and so on, getting on a list. I'd never heard of the rank of detective specialist before. So I could not find anything really about what was supposed to happen. That is to say, I was looking for, for example, evidence of irregularity, but I didn't understand what regularity would be. Could you help us out? Is there anything there that explains what is supposed to happen if your supervisor recommends you for this promotion? OK. Well, first of all, if I may, Morgan, who was his commanding officer, was supposed to be the one writing this up. But Shea, he was told, Sergeant Shea, who's an African-American, who you recently reversed some re-judgment decision against him, at least in part, also at highway, district highway. And he was told to do it because he was told that Morgan never would. Right, I remember that. But Shea, is that the correct pronunciation of his name? Yes, Shea is correct. S-E-E, I didn't remember. Andre Shea, that's correct. Sergeant Shea did fill out a promotion request. And again, I don't know whether it matters that it's the sergeant or a captain. But he did it. And then we hear nothing back. What was supposed to happen? What's the process? First of all, a promotion to detective, all types of detective, is discretionary. It's not mandatory. It's discretionary. You can't take a civil service test and become a detective. Not in the MIPD. That's not in the record. I'm sorry. I didn't think it would be something to be a source of concern. So then, who makes the decision? And it may be a discretionary judgment, but whose judgment? And what is the normal process? And let's start just with, is there anything in the record that explains that? No. There is nothing. But what is explained is that Morgan would not do it because he doesn't like black people. So that's the significance. Are you saying that whatever the process may be, and we don't know because it's in the record, nothing was done because of Morgan's thing? Is that your argument? We believe it would certainly help us if we knew what he ought to have done. It would have helped me also. But everyone denies they know what happened with the papers. Papers should have been submitted. If you read Ciara's review of Harge's contributions, it's outstanding. He just has to. But there's nothing in the record that suggests Morgan was involved in the decision, though you might think that a supervisor would generally be involved in that. Did I cut you off? No, no, go ahead. What is mentioned in Sergeant Shea's testimony is that Morgan should have done it because he was his commanding officer. He was the CEO, but he never would have done it. Never would have written the recommendation for promotion. Never would have written the recommendation. But there's not anything in the record that reflects whether he took any action against the recommendation or that he had any involvement. There's actually nothing in the record that I could find that determines what happened to the recommendation. Do you agree with the district court's analysis that the testimony, he wouldn't have been, he would never do it because he doesn't like African-Americans? That testimony would be inadmissible for the truth of that proposition? Yeah, we just discussed it, my associate and I. I think it's a tough sell. I definitely do. The only thing is under Title VII, if it's an admission by a supervisor, and Lieutenant Sally is a supervisor, that there's discrimination in the highway, that statement might be an admission by him that, hey, we have a problem with discrimination in the highway. We have a supervisor who doesn't like black people. So it might be admissible for that purpose. You're absolutely right, though, about the process. And we don't have that in the record. And I did ask those questions at depositions, but we didn't get anything conclusive from anybody. And we did a lot of depositions. Did you depose Sally? I deposed Sally. And what did he say about this conversation with Shea? Never happened. Nothing like that ever happens. There's never any discrimination in the highway. Harge didn't have any special conditions. So he denied having the conversation with Sergeant Shea, in which Shea says he requested Shea to write the recommendation, requested on Sciorra's behalf to Shea to write the recommendation, because Morgan doesn't like black officers. He certainly didn't say that Morgan, he didn't put it that way. He did not give me the ultimate question. He certainly didn't. None of them did. It's very hard, the NYPD, to go in and say, hey, we're a racist organization. These people work there for life. And they're getting their pension. You know, you can fill in the blanks, Judge Lynch. Yeah, I get the point. Go on. All right. So what I'd like you to look at, there are substantial harms to him, really substantial harms. And if you look at the overtime, that's the clearest thing about what the substantial harms are, besides the list of things I told you he was in. If you look at the overtime records, I'd like you to look at, if the court would like to, 1076 on. 2012, he had 533 and change hours of overtime. 2013, 525 hours of overtime. Then in 2014, when the two events happened in March, the recommendation for the detective specialist and the Mothers Against Drunk Driving Award, all of a sudden, at the end of March, his hours start going down for overtime. He's getting less arrests because the restrictions they put on him, which I described when I told you what Kazin said and how that affected arrests. He gets 366 hours. That's down approximately 170 hours. 2015, he's down to 290 hours. That's about half of what he was getting beforehand. 2016, he has 90.35 hours of overtime. But I should point out, in fairness to my adversary of the city, that he did get suspended in August over these charges, some of which we reversed in the trial room. But he did. But he worked more than half a year. So if you annualize it, it would be 180 hours. That would mean by two weeks. One of the problems that I had with the case is I found it hard to get a clear chronology of all of these events. I know when the award occurred in 2014. But it turns out, of course, that Officer Harge had disciplinary problems before 2014 as well. There's an allegation that he, or testimony that he was not allowed to drive an unmarked vehicle. But I didn't find, and maybe I just overlooked it, when was that? When did that happen? Because he doesn't have the exact date either. I see. But it would have to be after 2014 for this argument to make sense, right? It would have to be after, because he was doing a great, had a great record of getting arrests up to a certain point. But there's a sort of chronology problem in making the linkage to the unmarked car, for example, or to any of these other specific actions taken by the department. Well, when Kazin's there, he points out what's happening. Kazin's there a little later. And he's pointing out all the things that are being done to Harge. And at that point in time, he's permanently removed from certain things that nobody else is, from driving an unmarked car. You need an unmarked car to make an arrest. It's a little harder if you're a driver and you see a guy in a marked car. You've made the point. Our problem is with the chronology of when it happened, which would be helpful if we could know more. Well, I can help you in terms of the harms with the overtime records and the lists of the arrests and the difficulty in making the arrests we talked about. I don't want to be redundant. And if you look at 1076 on to 1084, you can see the arrests precipitously drop. Why? He's the same guy. Suddenly, he can't make the arrest because clearly, conditions change. They're calling him back to the station house for no reason. That's a big one, just interfering with him doing his job. And this is all really accelerates after the 2014 awards and the recommendation. And let me suggest, you made a point, Judge Lynch. He had a little bit of a disciplinary history. But if you look at the minor violations log, it was minor. What he had for a disciplinary record was minor. And in Lipke, who, by the way, they've referred to him as being African-American. Lipke refers to himself as Asian. And he's in the special appendix. I think it's page 54, referring to himself as Asian. Not that it matters. Be discriminated against by your own. But clearly, things change at a certain point in time. And looking at these will be very instructive. The arrests are overwhelming. 2012, they're overwhelming. In 2013, suddenly, they become slightly underwhelming. In 2014, and it gets worse and worse. Why? Because they were doing these things, making it hard for him to make arrests, making it hard for him to excel in his job. And to revisit it for a second, his disciplinary history was minimal. And again, Lipke wrote something up from five years earlier, after he got the awards. Suddenly remembered, five years earlier, he did something. And he sticks them in the minor violations logo, gives him a CD. I don't remember which, as I stand here today. Thank you. Thank you. Thank you for listening. Thank you. Good morning. May it please the court, Lorenzo DeSilvio on behalf of the city. So even when the record evidence is read in the light most favorable to Harge, the only reasonable inference here, let's put aside prima facie case, let's put aside differential treatment under the city human rights law, is that there was a legitimate, non-discriminatory, non-pretextual basis for the discipline that forms the heart of Harge's case here, namely his recorded, documented infractions at Highway 3. So something that counsel said just now, and also says in the reply brief, is in essence, the city is slicing it a bit too thinly. It needs to look at the totality of circumstances. But I push back against that for two reasons. One is that Harge is the one who's identifying about 19 discrete actions, their write-ups, their warnings, their command disciplines, over a six-year period. And he attributes them to individual decision-makers, six of them, that he's named as defendants here. So it makes sense to look at each of them in turn. And responding to Judge Calabresi's question about whether it's the case if something isn't an adverse action or would fall out of the picture, can that still form part of the totality of whether there was discrimination here? I think the answer to that question, Your Honor, is no. Because there's actually four things in the record of those 19 infractions where officers who are not black were disciplined for the same infraction or were given the same penalty for it. And I'm happy to walk the panel through that. I think those things fall out. What's left are about 15 actions that he's complaining about. But four of the things he admitted to, he accepted the penalty, or he testified under oath that he did not think that they were racially motivated. Five of the things were proven after a disciplinary trial where he had full procedural protections and the opportunity for judicial review. And three of the things, contrary to Harge's theory, which is that these supervisors had it out for him or were just looking for anything to get him on, three of the things that came about, I think generally, they might have all been involved in the disciplinary trial, were independently prompted by third party complaints outside of the department. How could those people have conspired to have affected the terms and conditions of his work when they're outside the agency? As the hearing officer said in the Article 78, applicable to one of those things, but good across the board, it would be the response of the department not to investigate it under those circumstances. So we just can't show, even if the burden comes all the way back to the city, he just can't show that any of the reasons here were pretextual. The same is true with respect to the assignments and the evaluations that he complains about. Some of the things he can't satisfy a prima facie case on. There's just no record evidence that officers who are not black with the same or similar disciplinary history had more presidential motorcades, got more overtime when they did presidential motorcades, or that they could drive to Sergeant McDonald when they, like Harge, or sorry, they couldn't drive Sergeant McDonald when they, like Harge, were assigned to court. Nor is there any record evidence that any of the named defendants were involved in the promotion. That was a question that Judge Lynch was asking, and I think counsel has conceded that there's just no record evidence of any of the defendants being involved in that. We just don't know what happened. And it does make sense to put the responsibility at plaintiff's feet in terms of, you know, he could have adduced record evidence to show what did happen or whether any of the defendants were involved, but there is no record evidence here. And finally on, there's just no evidence of pretext with the additional things. Harge can't show that, for instance, Morgan removed the sergeant that Harge was driving at the US Women's National Soccer Team parade because of Harge, not because the sergeant that he was driving was late. That's the reason that Morgan gave. He can't show that Sanford made Harge, you know, have the assignment. Wasn't there, I'm not sure this is necessarily racial in motivation, but isn't there evidence that the ultimate supervisor, I think it may have been Morgan himself, right, who removed the sergeant that Harge was driving from the parade, specifically criticized her for bringing that, I forget what derogatory terms we used. They weren't racial slurs, but they were derogatory statements about Harge. So how can you say there's no evidence that it was about Harge, rather than just about the sergeant? I think under the circumstances, because I think it shows that he doesn't like Harge. I think there's the fact issue. Well, but if there is other evidence that this man also didn't like Harge for racial reasons or had racial things, then isn't that enough to make a link, even though at that particular point, it was not any racial link? But if somebody says, is known to be a racist, and then does that, isn't that enough? No, Your Honor, and there's case law support that we cite in our brief as to why. So here, there's only about three things in the record that are directly said to Harge or in his presence that even sound in race. For instance, Sanford opined that Harge probably did intimidate Lipke because Harge is big and black. That was one. There was also a joke that Morgan made in the record. I don't think the party cited in their brief, where he asked for a map to be printed out in black and white. And Harge says he identifies as half black, half white. And so this was a comment of his biracial identity. And then he says that there was a comment by Sanford where he said he couldn't have a certain assignment, and he mentioned the word guma, which I understand to be Italian-American slang for girlfriend, mistress, or side piece, to use a colloquial term. But even if these comments were not made to him. Well, they were made to him. These were. Yes. But even if there were other comments that were not made to him, if somehow they are admissible, which is a different question. But if they are admissible, don't they say something about the decision when the decision was made by one of these people who made these comments? No, Your Honor, and for three reasons. First of all, we cite the case that involved the comment tar baby. That is so much more racially loaded than any of the things I just described. But even then, the court said, look, a reasonable juror might find that offensive, but wouldn't necessarily find it as being racist. And so, too, here. Second of all, the Tomasi case and the Dixon case stand for two propositions. One is a personal one, and one is a temporal one. The personal point is that just because someone says something that might be racially coded or even racist doesn't mean that another decision maker was necessarily influenced by that if the plaintiff has not connected the dots. The second point is a temporal one. No, no, only if it's the same decision maker. That's right. So only if it's the same decision maker. But even then, I would point this court to the Shea decision. Although there was a reversal with respect to the retaliation claims, this court was unanimous that summary judgment was properly granted on the disparate treatment claims. And that was even though there was record evidence in that case that Sanford had made two racist comments. That's what the panel describes, or the opinion describes the comments as, is racist. And I believe that they were made to Shea. But the court said, because Shea didn't have record evidence of when those comments were made in relation to any of the actions he was complaining about, that was not enough to defeat summary judgment there. And so I think those precedents stand for the proposition that it's not enough to say, well, someone might have said something at one point in time, even leaving aside the admissibility of double hearsay problem. How far do you go with that? Obviously, if somebody made a comment at some point and there's no sense at all of when, then a decision is not likely. But that doesn't mean that we need to have that comment be made right at the moment when the decision is made. I mean, there's something in between, isn't there? I think that's right, Your Honor. But here we're dealing with a six-year period of time. We don't know precisely when these comments were made in relation to any of the things. That's why the city claims are much easier, frankly, for Mr. Hart's vendor federal claims, but still. They still retain the core requirement, and I haven't heard Hargett's counsel identify any record evidence on the basis of which a jury could reasonably conclude that the legitimate nondiscriminatory reasons for the discipline here were, in fact, intentional. One of the problems with cases like this that bring together dozens of different incidents extending over a very long period, some trivial, some serious, and without a terribly clear distinction as to what is being alleged as a specific cause of action for disparate treatment, and what is just part of some sort of hostile work environment claim, it's all a moving target and very hard to sort out all the facts. But if we can focus briefly on the state claims, and particularly on the state claim for hostile work environment, which, as I understand it, under the New York City law, could be based on even a single incident if it's severe, could be based on a lesser showing, let's just say, than the federal claim. Now, you have the one episode in which Sanford specifically says you probably did intimidate, if it was Lipke or Lipke, because you're a big black guy. You've got that episode. You do have the fact that for much of this period, he is the only black officer. And we have testimony by a sergeant who says, I was told to load him up with extra work. I was told to make life difficult for him, essentially. So can you tell me why that's not enough? And I guess, first of all, tell me why that's not enough under New York City law for a hostile work environment claim, just what I just said. And then secondly, did Judge Lyman ever circle back and talk about the New York City claims specifically? He said he's going to. But none of the claims that are dismissed on federal grounds for not being adverse actions, there's never a return to those to ask, are they adverse actions under state law? And I didn't see any real analysis of the hostile work environment under New York City law. So A, why isn't that enough? And B, isn't there a problem that even if you argue to us that there's good reason why they should be dismissed, that the trial judge was more familiar with the record, never actually addressed it in? If I may, I'll address the second question first, Your Honor. So the city's position is that substantively, although the district court did not explicitly state that it was conducting a separate analysis of the city human rights law, it did because it did apply the proper standard as to the record evidence here, and did both causation-wise and in terms of liability. But in any event, because there's well-established case law that this court can affirm the grant of summary judgment on any grant supported by the record, and the parties have canvassed the argument thoroughly in the briefing, I think the court can and should address the question. So going to your first question, I think there's two reasons why the claim fails, even under the city human rights law. First of all, you are correct, Your Honor, that Hart doesn't disambiguate the facts that form the basis of his treatment claims, his harassment claims, his retaliation claims. So that's one issue. But really, what he's complaining about, for the most part, are assignments and evaluations wanted and not given, or normal, routine disciplinary measures for which there is a legitimate nondiscriminatory reason. We do not read even the city human rights law as having judicial intervention when it comes to disciplining someone who has either admitted to or been proven to have committed multiple infractions. What remains are two times that Levine denied him time off over a six-year period. He had to drive a belligerent drunk driver once. He had to park his car near the precinct. And he couldn't use a marked vehicle. But we cite case law that says, excuse me, I think it's more in the federal context, but says that that's not enough. And even under the city human rights law, that statute still says, unactionable are petty slights or personality conflicts. And I think that's what this amounts to here. The second reason is returning to the comments. The only basis that Harge has to connect the dots with respect to any of these actions being racially motivated are these comments. But we cite cases that, they're not Tomasi and Dixon, I believe. I think they're different cases that are in the harassment context. But they, too, stand for the proposition that you have to connect the dots. When was it said, who by, what decision were they making, how can you connect it to the actions here? Well, you have to connect the dots if you're talking about discrimination. If you're talking about a hostile work environment, that's not quite the same thing in terms of comments that are made. Isn't that different if there are enough comments made so that a jury could find that an environment was hostile? I don't think so. Isn't that different? No, because we have three comments said directly to Harge, and those are the only three, that sound in race, but they're not racially derogatory under this court's case law in the Tarbiby case. No, that's a different thing. You may be arguing that these comments are not enough. I'm just saying that when you're talking about a hostile work environment, the specific link between that and something happening isn't there. A hostile work environment is a more general statement. Well, let me try it a different way, Your Honor. These are comments that Morgan and Sanford made, but the vast majority of the discipline that it's complaining about came from Lipke, and then also from Levine and Santiago, who sometimes evaluated them. There is case law that said you have to connect the dots in terms of how is it that these comments by these decision-makers influence these people who are the immediate supervisors and the ones doing the actions. So I think that's the best way to address that question, Your Honor. I still don't understand. I mean, if it is an action which is discrimination against him, that's one thing. If it is a statement that there is an environment in which somebody who is black would find hostile, then comments which are not directed at him can create that environment. I don't believe that's correct under the case law that we cite in our brief, Your Honor, but you are the one who will be deciding, and I think you know the case law better than I do. Unless the panel has any further questions, this court should affirm. Thank you. I'd like to make a statement here. I've reserved three minutes, if I may. First of all, it's important to look for the city law under Hernandez v. Kaisman. And Hernandez v. Kaisman, they talk about totality of circumstances, which is also talked about in the federal law. But they say more than petty slights and inconveniences. I have shown a number of things, some of which did not result in that. But if the only thing we have is the city law, then isn't the appropriate thing for us to do? I mean, assuming our duendo now that we lose on the federal claim, and maybe even on the state, but then isn't the thing for us to do to dismiss without prejudice so that the city claims can be brought in state court? That is, if there is nothing left but a state claim, a claim under state law, and it's complicated, why should we decide? Well, that's really for you to decide. I mean, I have an opinion on it. I'd like you to reverse it on the city law, clearly. I'd like to reverse it on the federal law. Of course you'd like. But I'm just saying that if your main claim here is a city claim, then isn't the appropriate thing for us to say, OK, that's a state matter. Let it be tried in state court. The court below took it upon itself to rule on it. I understand. And we have any number of cases, if you will find, where we affirm but modify. That is, we affirm a judgment but modify so it doesn't apply to the state law claims. I mean, we can do that. We can do anything. But I would hope that you would take up the matter of the city law claim. You know, this is not commenting on the. Well, and your argument is because the district court did. I mean, it's not a situation where the district court chose to dismiss a lack of jurisdiction and we would then consider whether that was appropriate. This is a case where the district court ruled on it. You're arguing that it ruled incorrectly. And so we should just take him at his word. He assumed jurisdiction. And we should, if we think it's wrong, reverse and send it back for trial on the city claims, again, assuming that the federal claims fail. Yeah, and the district court also can hold on to it. I've seen Judge Glasser do that. I've tried a case in front of him where the federal claims were dismissed. And I believe it was Judge Glasser, yes. Can I just take one minute, Mr. Lickmarker? This is a bit off this particular case, but it's on this subject. You're an experienced lawyer in these areas. And I'm just wondering if you could tell me, what is the advantage of federal court? I'm sure there is one, because lots of you guys are bringing these cases in federal court, asserting federal claims, where it would seem that if the case does go to trial in federal court the way I would try them, I don't think I would even tell the jury there is such a thing as Title VII. Even if the federal claims survived, I'd say, here's the standard that you have to decide. If you find there is discrimination under the standards in the New York City law, the plaintiff wins. If you don't, the plaintiff loses. So I'm just wondering, why don't you just do that in state court? It's just totally a matter of curiosity. Is it that the docket is smaller here, or you get to trial faster? It's hard for me to believe you think federal judges are more interested in these cases, given the way they seem to come out so often in the district court, than state judges in New York City. But is there something you could just tell me as to why the federal court is preferable as a venue for this kind of case? I'll start with Monroe Friedman's quote. He considered me his protege, which is my greatest honor in my life. He said, cleaner bathrooms. No, but that was his constant comment about that. But the federal court, first of all, the state courts are overwhelmed, as I know these courts are. They're overwhelmed. Secondly, not to denigrate the state court judges, there is a very high standard. I'm not trying to pander anything. I understand. OK, that's probably enough. I just wanted to be clear on whether some of those theories that you hear about are, in fact, the reasons why these cases come before us. And we wind up spending an awful lot of our time trying to elucidate local law on this subject that seems to be much more favorable to plaintiffs. So that was my curiosity, and you've answered it. And I thank you. I appreciate your time. Take care. Thank you both. And we will take the matter under advisement. Thank you very much. Thank you. Thank you both. Thank you both. Thank you. The next case is United States v. Coons. Good morning. May it please the court, my name is Anne Berger, and I'm here on behalf of Appellant Victor Coons. At a supervised release violation hearing, the district court imposed a computer monitoring condition    The court ruled that the plaintiff's testimony of supervised release that incorporated by reference a probation computer monitoring program agreement. The court imposed the condition over objection and in the face of undisputed evidence from the defense's forensic computer expert that several of the probation program's conditions were unworkable and vague. The court did not impose the condition following an individualized assessment of Mr. Coons, any particular findings with respect to Mr. Coons, but instead, and I quote, because it's the condition that we've been ordering in all these kinds of cases. Now, Ms. Berger, could you help me a little bit with some of the background here? Do you know where these conditions, that is to say, the conditions of the program, come from? I take it that these are not things that this particular probation officer thought up and applied to Mr. Coons, right? I think you're right, Judge Lynch. This was the first time that I had laid eyes on the program conditions. I know that at this point, having looked at the record in the Browder case, when I think this court had occasion to, although it didn't rule on the conditions, talk about them. Yeah, some of us are inclined to dicta. So those conditions, at least in Browder, some of them were the same, but there were many differences. So it looks like there was an evolution over time between the program conditions then and then. Yes, and we've looked into some of the judgments in other cases in my chambers, and we've seen these in the Southern District and in the Western District in similar situations. And one of the reasons why I'm asking about this is it seems to me that there is something problematic about all of this, that we are taking up in these individualized circumstances things that are not individualized. That is to say, clearly, you're not contending that the district judge was not intimately familiar with Mr. Coons as an individual. Correct. And looked to his history and decided, and you're not challenging this, that it was appropriate to have a computer monitoring program. That's correct. And so the question really is, what, if anything, is an appropriate mechanism for courts to review the sort of specialized technical details? And I realize that there are different things that you're objecting to, and we could talk about them one by one, but some of them from your expert are sort of technical computer stuff, which we could. I can imagine a judge having a hearing about it and trying to hear competing experts and then to maybe construe these conditions in one way or another. But I have trouble imagining that the right way to do this is every time there is a re-imposition of a computer monitoring condition, or every time the probation department discovers some new.